IN THE

# ARIZONA COURT OF APPEALS

DIVISION TWO

_____

IN RE TERMINATION OF PARENTAL RIGHTS AS TO M.P.

_____

Nos. 2 CA-JV 2024-0093 and 2 CA-JV 2024-0094 (Consolidated)
Filed June 3, 2025

_____

Appeal from the Superior Court in Pima County
Nos. S20240024 and JD20230397
The Honorable Helena S. Seymour, Judge Pro Tempore

**VACATED AND REMANDED**

_____

COUNSEL

Robert A. Kerry, Tucson
*Counsel for Appellant Mother Maria P.*

Child and Family Law Clinic, Tucson
By Paul Bennett
*Counsel for Appellant M.P.*

Kristin K. Mayes, Arizona Attorney General
By Dawn R. Williams, Assistant Attorney General, Tucson
*Counsel for Appellee Department of Child Safety*

## OPINION

Judge Vásquez authored the opinion of the Court, in which Presiding Judge Eckerstrom concurred and from which Judge Sklar dissented.

V Á S Q U E Z, Judge:

¶1         Maria P. and her daughter M.P. each appeal the juvenile court's November 2024 ruling terminating Maria's parental rights to M.P., born in February 2023, based on neglect.[1] *See* A.R.S. § 8-533(B)(2). Their primary argument in this consolidated appeal is that Maria's constitutional rights were violated because the court terminated her parental rights without considering her compliance with the case plan and participation in reunification services. They also challenge the sufficiency of the evidence to support the court's best-interests finding. For the following reasons, we vacate and remand.

### Factual and Procedural Background

¶2         We view the facts in the light most favorable to affirming the juvenile court's ruling. *See Christina G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 231, ¶ 13 (App. 2011). In September 2023, Maria called 9-1-1 after M.P. refused to eat and Maria was concerned that her daughter was having a seizure. Seven-month-old M.P. weighed approximately seven pounds at the hospital and was diagnosed with severe malnutrition. She was observed to have sunken eyes and cheeks and loose, hanging skin. A computed tomography scan of M.P.'s brain showed atrophy from the malnutrition. Maria reported that she was breastfeeding M.P. and that she and M.P.'s father had adopted "a more holistic approach to life." The Department of Child Safety (DCS) took custody of M.P., and Maria was arrested for child abuse. Maria subsequently pled guilty to one count of attempted child abuse and was placed on probation for seventeen years.

¶3         In September 2024, DCS filed a dependency petition, alleging, as to Maria, that M.P. was dependent due to neglect—specifically, that Maria had "failed to recognize early signs of malnutrition" and had "failed to take appropriate action to ensure the child's wellbeing." DCS

---

[1]The juvenile court also terminated the parental rights of M.P.'s father, Alonzo M. He is not a party to this appeal.

additionally alleged that Maria had neglected M.P. because of domestic violence between Maria and M.P.'s father. In November 2023, Maria entered a no-contest plea to an amended petition, and the juvenile court adjudicated M.P. dependent as to her. Consistent with DCS's recommendation, the court set a case plan goal of family reunification and ordered DCS to provide services to accomplish the goal. Upon Maria's motion, the court placed M.P. with Maria's sister. At a review hearing in January 2024, the court found that DCS was making reasonable efforts to accomplish the case plan goal and that Maria was compliant with the plan tasks. The court therefore affirmed reunification as the goal.

¶4 The following month, however, DCS filed a petition for termination of the parent-child relationship, solely alleging that Maria had neglected M.P. by "causing the child to have severe malnourishment while in her care and custody." Meanwhile, at a permanency hearing in March 2024, the juvenile court again found Maria was "fully compliant with the case plan tasks" and affirmed the case plan goal of family reunification. In April 2024, the court held an initial severance hearing and set the trial.

¶5 On June 7, 2024, M.P. filed a motion for summary judgment on the petition for termination. She argued that DCS's petition was "constitutionally deficient for failure to consider the parent's progress toward reunification or current ability to safely and effectively parent." M.P. further asserted that DCS could not "now claim that reasonable efforts would be futile" because DCS had "prepared and presented a reunification case plan," suggesting it thought the plan had a "reasonable prospect of success." DCS moved to strike the motion as untimely. It reasoned that Rule 318(b), Ariz. R. P. Juv. Ct., requires such motions to be filed at least forty-five days before the adjudication hearing and that M.P.'s motion was filed forty-one days before the trial. In response, M.P. asked the juvenile court to deny the motion to strike because DCS was asking "for a hypertechnical reading of a procedural rule—from which it suffers no prejudice—to prevent [the juvenile court] from addressing the merits of the constitutionality" of the petition for termination. Maria joined M.P.'s response. After a hearing, the court found M.P.'s motion for summary judgment untimely and granted DCS's motion to strike.

¶6 At a dependency review hearing days before the start of the severance trial, the juvenile court again found Maria to be complying with the case plan and affirmed the goal of family reunification. The severance trial took place over several days, ending in August 2024. M.P. requested that the court deny the petition for termination, again arguing that the petition had "failed to consider the parents' progress towards reunification

or their current ability to safely and effectively parent their child." She maintained that because DCS had implemented "a significant array of reunification services, the hopes of which the parents, [M.P.,] and many others relied upon, [DCS] is estopped from terminating the parental rights based solely on circumstances that existed before the services were put in place." Maria joined that argument.

¶7            In November 2024, the juvenile court granted DCS's petition for termination of the parent-child relationship based on neglect.[2] The court explained, in part, that Maria had neglected M.P. by causing malnourishment and that she "was aware that she was producing limited breast milk" but "took no steps to obtain timely medical care for" M.P. The court also found that termination was in M.P.'s best interests, explaining that M.P. would benefit from termination as she would be "freed for adoption," is entitled to permanency, and is in "a prospective adoptive placement," where she has been thriving. The court further found M.P. "would be harmed if termination is denied notwithstanding the bond she has with [Maria]." The court considered Maria's completion of various reunification services but found she had not "demonstrated any significant behavioral changes or understanding of how to protect [M.P.] from future abuse or neglect, including domestic violence." M.P. and Maria each appealed, and we consolidated their appeals.[3]

**Discussion**

¶8            Although Maria and M.P. frame their arguments somewhat differently, the thrust is the same—Maria's constitutional rights were violated when the juvenile court terminated her parental rights based solely on neglect without adequately considering her progress in reunification services. Specifically, Maria argues that her due process rights were violated because the juvenile court "relied on prescience rather than the facts in the record." She further contends that the court's best-interests

_____

[2]Although the severance trial pertained to both parents, the juvenile court asked the parties whether they would need to submit additional evidence if it were inclined to order a "one-parent severance." At the end of the trial, the court gave the parties leave to file notices regarding their positions, which they did, and the court ultimately granted termination as to both parents.

[3]Although M.P. opposed the termination as to both parents below, her challenge on appeal is seemingly limited to the termination of Maria's parental rights.

finding was not supported by reasonable evidence because she "consistently has demonstrated she now understands the necessity of proper medical care for" her daughter. M.P. asserts that where DCS "has offered reunification services for months and a parent is in full compliance with the . . . case plan, the constitution and Arizona public policy require" consideration of "the parent's efforts to determine if all other efforts to preserve the family have failed and there is no hope of return" before a court may order termination. And because the juvenile court failed to do so here, M.P. maintains that it erred as a matter of law.

¶9     We will affirm a severance order if reasonable evidence supports the factual findings and the juvenile court's legal conclusions are not clearly erroneous. *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, ¶¶ 30-31 (2023). In doing so, we generally defer to the juvenile court's factual findings because, as the trier of fact, that court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, ¶ 4 (App. 2004). However, we review issues of law de novo. *Holly C. v. Tohono O'odham Nation*, 247 Ariz. 495, ¶ 26 (App. 2019).

¶10     "Parents possess a fundamental liberty interest in the care, custody, and management of their children." *Kent K. v. Bobby M.*, 210 Ariz. 279, ¶ 24 (2005); *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (describing interest of parents in care, custody, and control of their children as oldest of fundamental liberty interests). "Although fundamental, parental rights are not inviolate." *Dominique M. v. Dep't of Child Safety*, 240 Ariz. 96, ¶ 7 (App. 2016). "A court may order severance of parental rights under certain circumstances, so long as the parents whose rights are to be severed are provided with 'fundamentally fair procedures' that satisfy due process requirements." *Kent K.*, 210 Ariz. 279, ¶ 24 (quoting *Santosky v. Kramer*, 455 U.S. 745, 754 (1982)). To that end, Arizona has established a formal process for terminating parental rights. A.R.S. §§ 8-531 through 8-544.

¶11     Specifically, § 8-533(B) provides a two-step inquiry for termination of a parent-child relationship. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, ¶ 8 (2018). First, the juvenile court must find by clear and convincing evidence that at least one of the enumerated statutory grounds for termination exists. *Sandra R. v. Dep't of Child Safety*, 248 Ariz. 224, ¶ 12 (2020). Second, the court must find by a preponderance of the evidence that termination of the parent's rights is in the child's best interests. *Id.* While the first step focuses on the fitness of the parent, the second centers on the best interests of the child. *Alma S.*, 245 Ariz. 146, ¶¶ 9, 12. The petitioner—

DCS in this case—bears the burden of proof as to both inquiries. Ariz. R. P. Juv. Ct. 353(c).

¶12        When our legislature adopted § 8-533(B) in 1970, it identified the purpose of the act as providing for the "voluntary and involuntary severance of the parent-child relationship . . . by judicial process which will safeguard the rights and interests of all parties concerned." 1970 Ariz. Sess. Laws, ch. 153, § 1. The legislature added:

> Implicit in this act is the philosophy that, wherever possible, family life should be strengthened and preserved and that the issue of severing the parent-child relationship is of such vital importance as to require a judicial determination . . . . This judicial action is intended primarily for those situations where other judicial remedies appear inappropriate.

*Id.* Thus, our system seeks to preserve "parental interests when the parent grasps the opportunity quickly, diligently, and persistently." *In re Pima Cnty. Juv. Severance Action No. S-114487*, 179 Ariz. 86, 101 (1994).

¶13        As relevant here, § 8-533(B)(2) provides, as a ground for termination, "[t]hat the parent has neglected or willfully abused a child." Neglect is statutorily defined as "[t]he inability or unwillingness of a parent . . . of a child to provide that child with supervision, food, clothing, shelter or medical care if that inability or unwillingness causes substantial risk of harm to the child's health or welfare." A.R.S. § 8-201(25)(a). Neglect is, thus, not a fixed concept but "varies as the context of the circumstances changes." *In re Pima Cnty. Juv. Action No. S-111*, 25 Ariz. App. 380, 389 (1975); *cf. Joelle M. v. Dep't of Child Safety*, 245 Ariz. 525, ¶ 13 (App. 2018) (explaining that "dependent child," despite statutory definition, "is a variable standard, necessarily tethered to the child's medical condition and individual needs"). With respect to the best-interests determination, termination is appropriate "if either: (1) the child will benefit from severance; or (2) the child will be harmed if severance is denied." *Alma S.*, 245 Ariz. 146, ¶ 13.

¶14        Here, the juvenile court found by clear and convincing evidence that Maria had neglected M.P. under § 8-533(B)(2). However, the court declined to consider Maria's participation in reunification services as part of its statutory finding. The court observed that § 8-533(B)(2) "does not expressly require that the parents be provided reunification services" and

that "there is not a constitutional requirement to provide reunification services." However, the court considered Maria's participation in services as part of its best-interests finding. The court noted Maria's compliance with the case plan and found she had shown "some benefit," but it also found she had not "demonstrated any significant behavioral changes or understanding of how to protect [M.P.] from future abuse or neglect, including domestic violence."

¶15 As an initial matter, we agree with the juvenile court that § 8-533(B)(2) does not require DCS to provide reunification services. The text of § 8-533 plainly requires DCS to make diligent efforts to provide appropriate reunification services for terminations based on out-of-home placement under § 8-533(B)(8) and (B)(11). *See* § 8-533(D). No such language appears in subsection (B)(2). Courts have also concluded that DCS must make diligent and reasonable efforts to preserve the family or show that preservation efforts would be futile before the juvenile court may terminate parental rights under § 8-533(B)(3) based on mental illness, *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, ¶¶ 29-34 (App. 1999), and chronic substance abuse, *Jennifer G. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 450, ¶ 12 (App. 2005), or under § 8-533(B)(4) based on incarceration, *Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574, ¶¶ 20-21 (2021). However, we are not convinced the same constitutional principles obligate DCS to provide reunification services when the termination is based on abuse or neglect. *Cf. Bobby G. v. Ariz. Dep't of Econ. Sec.*, 219 Ariz. 506, ¶ 11 (App. 2008) ("[N]either § 8-533 nor federal law requires that a parent be provided reunification services before the court may terminate the parent's rights on the ground of abandonment."); *Toni W. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 61, ¶ 9 (App. 1999) (legislature amended § 8-533(B) to remove requirement that services be provided before parental rights may be terminated based on abandonment). Indeed, M.P. recognizes that "[t]here may well be situations of neglect or abuse that are so egregious that, at the outset, reunification efforts would be futile or even harmful."

¶16 Notwithstanding the lack of a requirement to provide reunification services, however, DCS chose to offer such services to this family rather than immediately petition for termination of the parent-child relationship. *See* Ariz. R. P. Juv. Ct. 351(a)-(b) (describing petition versus motion for termination). We recognize that part of the reason DCS offered services was to allow it to undertake additional investigation into the circumstances that had brought M.P. into its care and custody. However, that does not change the fact that services were offered and that the juvenile court adopted a case plan goal of family reunification. This is significant because it shows that DCS did not deem the alleged neglect to be willful

and signals DCS's necessarily limited level of concern over Maria's parenting ability.

¶17     As the juvenile court repeatedly found, Maria complied with the case plan and participated in reunification services with the understanding that, if she did well, M.P. would be returned to her.[4] Importantly, for several months, Maria and M.P. continued to build their relationship and bond through regular and consistent parenting time that lasted at least four to five hours per day for five to six days a week by the time of the severance trial.  At no point did DCS seek to eliminate Maria's parenting time out of concern for M.P.'s wellbeing.   Instead, DCS recommended that Maria "continue to engage in and benefit from services recommended in her Case Plan to ensure that she w[ould] be a safe and appropriate parent for [M.P.]"

¶18     After Maria participated in and benefited from months of reunification services,[5] DCS filed its petition for termination based solely on the neglect arising from M.P.'s malnourishment.  Yet, at the same time, DCS did not oppose the juvenile court's affirmance of the case plan goal of family reunification as part of the dependency.  By offering reunification services and not opposing the goal of family reunification, DCS made Maria's participation in and benefit from services relevant to a determination of her parental fitness under § 8-533(B)(2). *See Jessie D.*, 251 Ariz. 574, ¶ 18 (court may sever parent-child relationship "only in the most extraordinary circumstances, when all other efforts to preserve the relationship have failed" (emphasis omitted) (quoting *In re Maricopa Cnty. Juv. Action No. JA 33794*, 171 Ariz. 90, 91-92 (App. 1991))).

¶19     Section 8-533(B)(2) provides that termination is justified if a parent "has neglected" a child.  The past-tense verb "neglected" establishes that a previous inability or unwillingness to provide for a child justifies termination.  *See Jade K. v. Loraine K.*, 240 Ariz. 414, ¶¶ 12-20 (App. 2016) (past neglect may serve as basis for termination); *Mario G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 282, n.5 (App. 2011) (section 8-533(B)(2) directed at

---

[4]On a notice provided by DCS at the start of the dependency, Maria signed her name indicating she understood that she "must participate in all the services that DCS offers . . . to help reunite [her] with [M.P.]"

[5]Maria completed every service on her case plan, except for the psychological evaluation, which her criminal defense attorney had advised against.  At the time of trial, however, Maria indicated that she was willing to complete the evaluation.

preventing future abuse based on past conduct), *abrogated on other grounds by Sandra R.*, 248 Ariz. 224, ¶ 15. Neglect is therefore considered proxy for parental unfitness. *Alma S.*, 245 Ariz. 146, ¶ 10. However, § 8-533(B)(2) does not require—it merely permits—termination upon a finding of neglect. This is because the parental unfitness requirement is also "circumscribed by constitutional considerations." *Sandra R.*, 248 Ariz. 224, ¶ 23; *see also Santosky*, 455 U.S. at 753 ("The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State."). "Inherent in this requirement is a demonstrable connection between the ground for termination and the harm or risk of harm to a child." *Sandra R.*, 248 Ariz. 224, ¶ 24.

¶20        The question before us is whether a juvenile court may constitutionally decline to consider evidence of parental fitness simply because it has made a finding of neglect under § 8-533(B)(2). The answer must be no. "[A]s with any parental rights termination, *Santosky* requires a finding of parental unfitness as to a child by at least clear and convincing evidence." *Sandra R.*, 248 Ariz. 224, ¶ 24 (citing *Santosky*, 455 U.S. at 769-70). Implicit in such a finding is that the juvenile court consider all relevant evidence. *See* Ariz. R. Evid. 401 (evidence is relevant if it has any tendency to make a fact more or less probable and fact is of consequence). Put another way, a court cannot conduct proper factfinding on parental unfitness if it excludes from its analysis substantial pertinent evidence that contradicts that finding. Our supreme court has directed that no application of § 8-533(B)(2) "may circumvent this fundamental constitutional requirement" that parental unfitness be proven by clear and convincing evidence. *Sandra R.*, 248 Ariz. 224, ¶ 24. Exclusion of relevant evidence would do just that and, therefore, fails to comport with our due process principles. *See id.* ¶ 12; *Santosky*, 455 U.S. at 769 ("We hold that such a standard adequately conveys to the factfinder the level of subjective certainty about his factual conclusions necessary to satisfy due process.").

¶21        Here, the record shows that, at the time M.P. was hospitalized, Maria, who was twenty-one years old, was struggling with mental-health issues and postpartum depression, which led to a lack of eating. She was estranged from her family and in a relationship with Alonzo, who was physically and emotionally abusive, which further contributed to her depression. Maria did not realize that she was not getting adequate nutrition herself to breastfeed M.P.

¶22          By the time of the severance trial, however, Maria's heath had improved both physically and mentally. She testified to an improved relationship with her family, as well as a better understanding of "the cycle of abuse" and "healthy relationships." Her therapist stated that, since starting therapy, Maria had "demonstrated a lot of insight" into her relationship with Alonzo and "how that relationship impacted other aspects of her life." The therapist also recognized the "positive changes" Maria was making to herself, including working with a recovery coach and enrolling in additional programs. According to the therapist, Maria's "assertiveness," "confidence," and "increased ability for abstract thought and problem solving" had improved. Maria also saw a dietician, a primary care physician, and a lactation specialist, who helped her to understand what she needed to eat to be able to produce enough breastmilk.

¶23          "[T]he permanent severance of the parental relationship is a power of awesome magnitude that must be exercised with great rectitude and always cognizant of the fundamental rights at stake." *Alma S.*, 245 Ariz. 146, ¶ 26 (Bolick, J., concurring); *see also* 1970 Ariz. Sess. Laws, ch. 153, § 1. In a case like this, where the neglect largely consisted of Maria's ignorance related to her inability to produce adequate breastmilk and therefore nourish her child, which was compounded by her mental-health issues, Maria's subsequent education and conduct—encouraged and enabled by DCS's provision of reunification services—is undoubtedly relevant to an assessment of whether she had an "inability or unwillingness" to provide for M.P. § 8-201(25)(a); *see Sandra R.*, 248 Ariz. 224, ¶ 23 (extrapolation of parental unfitness "circumscribed by constitutional considerations"); *see also Pima Cnty. Juv. Action No. S-114487*, 179 Ariz. at 101.

¶24          We recognize the severity of the situation Maria had exposed M.P. to before she was admitted to the hospital—the record establishes that M.P. was severely malnourished. And issues of credibility are undoubtedly reserved for the juvenile court. *See Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, ¶ 15 (App. 2014) ("[T]he juvenile court is in a much better position than this court to evaluate the effectiveness and impact of the services provided, as credibility determinations may be required to weigh the evidence presented."). But the question before us is not one of credibility. It is a question of whether DCS established by clear and convincing evidence that Maria was an unfit parent.

¶25          As explained above, neglect is statutorily defined in § 8-201(25)(a), but it is also a malleable concept based on the individual circumstances of the case. *Pima Cnty. Juv. Action No. S-111*, 25 Ariz. App. at 389. We disagree with our dissenting colleague that we are rewriting the

definition of neglect by interpreting it in this way. Instead, we are simply giving meaning to the necessarily broad language of § 8-201(25)(a), which is intended to reach numerous types of neglect, from willful to, as in Maria's case, unintentional. *See* § 8-201(25)(a); *Tanya K. v. Dep't of Child Safety*, 240 Ariz. 154, ¶ 5 (App. 2016) (we apply clear language of statute, giving meaning to all provisions and considering statute's context); *E.R. v. Dep't of Child Safety*, 237 Ariz. 56, ¶ 14 (App. 2015) (primary purpose of severance statute is to protect health and safety of children). And the type of neglect alleged in this case is one that can reasonably be addressed, largely through education. *Cf. Alma S.*, 425 Ariz. 146, ¶ 10 (grounds listed in § 8-533(B) "are proxies for parental unfitness because" they "address the most serious instances of parental abuse, neglect, or incapacity").

**¶26** It is axiomatic that we will not interpret a statute in such a way as to produce absurd results. *See Tanya K.*, 240 Ariz. 154, ¶ 5. Allowing the juvenile court to sever a parent's rights under § 8-533(B)(2) based solely on an unintentional act of neglect that was the result of the parent's ignorance and that has since been remedied would do just that. It would also eviscerate that parent's fundamental liberty interests in the care, custody, and control of his or her children. The legislature made us the judicial backstop to safeguard these rights. 1970 Ariz. Sess. Laws, ch. 153, § 1. We respect that great responsibility, also bearing in mind our role as interpreters of the law. Thus, we conclude the juvenile court must consider Maria's compliance with the court-ordered case plan and completion of reunification services when determining whether DCS met its burden of proof of establishing neglect. *See Kent K.*, 210 Ariz. 279, ¶ 36 ("Use of a heightened standard of proof at the fact-finding stage recognizes the severe consequence of an erroneous determination of unfitness: Error at this stage could lead to permanently extinguishing the relationship between a fit parent and his or her child.").

**¶27** As noted above, the juvenile court considered Maria's compliance with the case plan and her benefit from services as part of its best-interests finding. Arguably, consideration of those matters as part of that analysis was proper. *See Alma S.*, 245 Ariz. 146, ¶ 1 (in making best-interests determination, courts must consider "totality of the circumstances existing at time of severance," including parent's rehabilitation). But we question whether consideration of a parent's benefit from services under the best-interests analysis is sufficient. The best-interests analysis can be proven in two ways—by showing that the child will benefit from severance or will be harmed if severance is denied. *Alma S.*, 245 Ariz. 146, ¶ 13. The benefit prong can be satisfied by a showing that the child is adoptable or in a more stable setting. *See Dominique M.*, 240

Ariz. 96, ¶ 8. Such a finding, therefore, requires no consideration of a parent's success in services, even if significant and highly commendable. Indeed, as shown below, the best-interests requirement was met in this case without consideration of Maria's participation in services. A parent's hard work to remedy his or her child's removal must be part of the termination calculus, particularly when DCS encourages the parent to participate for return of the child. *See Pima Cnty. Juv. Action No. S-114487*, 179 Ariz. at 101.

¶28 In any event, the statutory grounds for a termination finding requires a separate analysis with a heightened burden of proof—clear and convincing evidence. *Sandra R.*, 248 Ariz. 224, ¶ 12; *see also Kent K.*, 210 Ariz. 279, ¶ 24 ("Application of the proper standard of proof in a termination hearing is a critical component of the 'fundamentally fair procedures' necessary to satisfy due process."). Such consideration as part of a best-interests determination, with a preponderance standard of proof, therefore does not pass "constitutional muster." *Sandra R.*, 248 Ariz. 224, ¶¶ 12, 24 (citing *Santosky*, 455 U.S. at 769-70).

¶29 In sum, the juvenile court erred in failing to consider Maria's participation in and benefit from services—which were offered by DCS as part of the related dependency proceeding with a case plan goal of family reunification—in its finding of parental unfitness under § 8-533(B)(2). It is important to note that we are not suggesting reunification services or a case plan of family reunification are required, even in cases of unintentional neglect. We simply conclude that when DCS seeks to terminate a parent's rights based solely on neglect while also offering services as part of a court-ordered family reunification plan, the parent's performance in and benefit from those services must be considered as part of the court's determination of parental unfitness. We therefore vacate the court's termination ruling and remand for the court to reconsider whether DCS established by clear and convincing evidence the statutory ground for termination. However, because the parties' best-interests arguments are unaffected by our remand and will likely recur in a potential subsequent appeal, we address them.

¶30 As stated above, termination is in a child's best interests if: "(1) the child will benefit from severance; or (2) the child will be harmed if severance is denied." *Alma S.*, 245 Ariz. 146, ¶ 13. Here, the juvenile court found that M.P. "would benefit from a termination of her parents' rights as she would be freed for adoption" and that she "would be harmed if termination is denied notwithstanding the bond she has with each of her parents." In part, the court explained its primary concern was "ensuring

that [M.P.] has stability and security" and "M.P.'s need for structure and stability outweighs her bond with her parents."

¶31     At bottom, Maria and M.P. both seem to request that this court reweigh the evidence on appeal. This we will not do. *Oscar O.*, 209 Ariz. 332, ¶ 4. Instead, we review the record for reasonable evidence supporting the juvenile court's findings. *Brionna J.*, 255 Ariz. 471, ¶¶ 30-31.

¶32     M.P. is a healthy two-year-old child and is adoptable. At the time of the severance trial, she was placed with her maternal aunt, who was meeting all of her needs and was willing to adopt M.P. *See Dominique M.*, 240 Ariz. 96, ¶ 8 (termination benefits child if child is adoptable or more stable in existing placement). The caseworker testified that M.P. was bonded with her aunt but, given her age, M.P. "would be able to bond with other families should that need to happen." The caseworker had also identified another family member, the maternal grandmother, who was willing to adopt M.P. Because the juvenile court's findings of a benefit to M.P. are supported by the record, we cannot say it erred in concluding that termination was in M.P.'s best interests.[6] *See Brionna J.*, 255 Ariz. 471, ¶¶ 30-31.

## Disposition

¶33     We vacate the juvenile court's termination ruling and remand for the court to consider whether DCS established Maria's parental unfitness under § 8-533(B)(2), in light of her completion of reunification services.

S K L A R, Judge, dissenting:

¶34     Today's opinion rewrites Arizona law. Juvenile courts considering termination for neglect under A.R.S. § 8-533(B)(2) must now consider the parent's "participation in and benefit from services" provided by DCS. The statutory scheme does not require them to do so. Rather, it provides that neglect is "sufficient to justify the termination of the

---

[6]Because reasonable evidence supports the juvenile court's benefit finding, we need not address its additional finding of a harm to M.P. if the termination were denied. *See Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, ¶ 16 (2016) ("Framed in the disjunctive, this standard permits a finding of best interests based on either a benefit to the child from severance or some harm to the child if severance is denied.").

parent-child relationship" if termination is in the child's best interests. Under the majority's opinion, "sufficient" now means "necessary."

¶35 The majority justifies this rewrite by framing it as an application of due process. It is not. As our supreme court has concluded, a parent's due-process rights are satisfied when a juvenile court finds, by clear and convincing evidence, that a statutory ground for termination exists. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, ¶ 9 (2018). The majority also reasons that neglect "is a malleable concept based on the circumstances." But "neglect" is defined by statute. A.R.S. § 8-201(25). That definition includes a parent's "inability or unwillingness" to provide a child with food or medical care. And past neglect supports termination. § 8-533(B)(2).

¶36 Properly applying the law, the evidence supports the juvenile court's conclusion that Maria neglected M.P. by allowing her to starve. The evidence also supports the court's conclusion that termination of Maria's parental rights is in M.P.'s best interests. This is true even after consideration of Maria's rehabilitation. Although reasonable minds could disagree with the court's weighing of the evidence, I find no error in its analysis. I therefore respectfully dissent.

## I. Background on due-process considerations in termination proceedings based on neglect

¶37 As the majority explains, a juvenile court must undertake two inquiries before terminating parental rights. First, the court must find by clear and convincing evidence the existence of at least one statutory ground set forth in Section 8-533(B). *Sandra R. v. Dep't of Child Safety*, 248 Ariz. 224, ¶ 12 (2020); *see also* A.R.S. § 8-537(B) ("The court's findings with respect to grounds for termination shall be based on clear and convincing evidence."). If such a ground exists, the court must also find by a preponderance of the evidence that termination is in the child's best interests. *Sandra R.*, 248 Ariz. 224, ¶ 12. When a court makes those findings, it is "sufficient to justify the termination of the parent-child relationship." § 8-533(B).

¶38 This case concerns one of the statutory grounds, Section 8-533(B)(2), which applies when the "parent has neglected or willfully abused a child." There is no suggestion that Maria willfully abused M.P., so the issue is whether she "neglected" her. As relevant here, "neglect" means a parent's "inability or unwillingness . . . to provide [a] child with supervision, food, clothing, shelter or medical care if that inability or unwillingness causes substantial risk of harm to the child's

health or welfare." § 8-201(25)(a). And because the legislature in Section 8-533(B)(2) used the words "has neglected," past neglect is sufficient to satisfy the standard. *See Jade K. v. Loraine K.*, 240 Ariz. 414, ¶¶ 12-20 (App. 2016). When a court makes a finding of neglect, that is "sufficient to justify the termination of the parent-child relationship," provided that doing so is also in the child's best interests. § 8-533(B).

**¶39** This determination, like the determination of any statutory ground, involves a constitutional dimension, as it concerns parental fitness. *See Alma S.*, 245 Ariz. 146, ¶ 9. Thus, consistent with due process, the United States Supreme Court requires courts to make findings of a statutory ground by clear and convincing evidence. *Santosky v. Kramer*, 455 U.S. 745, 769 (1982). This requirement is among the "fundamentally fair procedures" that are "necessary to satisfy due process." *Kent K. v. Bobby M.*, 210 Ariz. 279, ¶ 24 (2005) (quoting *Santosky*, 455 U.S. at 754).

**¶40** More broadly, due process prevents a court from terminating a parent's rights "unless the parent is unfit as a matter of law." *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, ¶ 19 (2023). As applied in Arizona, this requires juvenile courts to "evaluat[e] the facts of a case through the lens" of Section 8-533(B). *Id.* When they do so, they "provide[] the appropriate due process protections." *Id.* As the Arizona Supreme Court has explained, this is because the grounds laid out in that section are "synonymous with parental unfitness." *Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574, ¶ 8 (2021) (quoting *Jessica P. v. Dep't of Child Safety*, 249 Ariz. 461, ¶ 31 (App. 2020), *vacated on other grounds by* CV-20-0241-PR, 2020 WL 8766053, at *1 (Ariz. Dec. 15, 2020)); *see also Alma S.*, 245 Ariz. 146, ¶ 10 (providing that most Section 8-533(B) grounds are "proxies for parental unfitness because they demonstrate a parent's inability 'to properly parent his/her child'" (quoting *Roberto F. v. Ariz. Dep't of Econ. Sec.*, 232 Ariz. 45, ¶ 42 (App. 2013))).

## II. Due process does not require juvenile courts, in neglect cases, to consider the broad scope of evidence identified by the majority

**¶41** Consistent with our supreme court's case law, the juvenile court evaluated the termination issue under Section 8-533(B). *See Jessie D.*, 251 Ariz. 574, ¶ 8. This court may not contradict the supreme court's conclusion that a court's compliance with that statute satisfies due process. *Id.*; *City of Phoenix v. Leroy's Liquors, Inc.*, 177 Ariz. 375, 378 (App. 1993) ("[W]e are bound by decisions of the Arizona Supreme Court and have no authority to overrule, modify, or disregard them."). Nevertheless, the majority concludes that due process requires more. Under its opinion, juvenile courts determining whether a statutory ground exists must also

consider "all relevant evidence" concerning parental fitness. As applied here, that means Maria's "participation in and benefit from services."

¶42        But the boundaries of "parental fitness" are not for the court to determine. The legislature has already determined them, as set forth in Section 8-533(B). Any other definition amounts to rewriting the statute to substitute the court's own boundaries. We may not do so. *Orca Commc'ns Unlimited, LLC v. Noder*, 236 Ariz. 180, ¶ 11 (2014) ("It is not the function of the courts to rewrite statutes." (quoting *City of Phoenix v. Butler*, 110 Ariz. 160, 162 (1973))). Indeed, under the majority's view, the categories listed in Section 8-533(B) simply function as necessary conditions for termination, though the statute makes them "sufficient."

¶43        As support for its view, the majority relies on *Sandra R. v. Dep't of Child Safety*, 248 Ariz. 224 (2020). However, the constitutional issues implicated in *Sandra R.* are not present here. That case also involved a termination proceeding under Section 8-533(B)(2), but with an important distinction. In that case, the child who was the subject of the proceeding had not been the subject of abuse or neglect. *Sandra R.*, 248 Ariz. 224, ¶¶ 8-9 (explaining that child's sibling had been abused). When that occurs, *Sandra R.* requires juvenile courts to find "by clear and convincing evidence, that there is a risk of harm" to the child at issue. *Id.* ¶ 17.

¶44        This requirement is consistent with a prior line of cases that required a "constitutional nexus" between the abuse of the child who is subject to the termination proceeding and another child. *See, e.g.*, *Mario G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 282, ¶ 16 (App. 2011), *overruled in part by Sandra R.*, 248 Ariz. 224, ¶¶ 15-17; *Linda V. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 76, n.3 (App. 2005), *overruled in part by Sandra R.*, 248 Ariz. 224, ¶¶ 15-17. I am unaware, however, of any case that imposes a similar requirement for circumstances involving abuse or neglect of the child at issue in the same case.

¶45        The majority glides past this distinction, pointing to language in *Sandra R.* that due process requires "a demonstrable connection between the ground for termination and the harm or risk of harm to a child." 248 Ariz. 224, ¶ 24. But the connection between the ground for termination and "the harm" necessarily exists where the child at issue has been abused or neglected. And *Sandra R.* uses the word "or" between "the harm" and "risk of harm." 248 Ariz. 224, ¶ 24. Thus, either is sufficient to satisfy due process. Because the juvenile court found harm here, it did not need to separately address risk of harm.

¶46        Aside from *Sandra R.*, the majority cites no case law to suggest that due process requires the analysis that juvenile courts must now undertake. Nor have I found any case to impose such a requirement. I acknowledge, however, that one justice on our supreme court appears to support doing so. *Alma S.*, 245 Ariz. 146, ¶ 30 (Bolick, J., concurring) ("A glaring omission from the statute, from a due process perspective, is its failure to expressly require consideration of a parent's rehabilitation where the statutory ground for termination does not necessarily suggest permanent unfitness."). That may be good public policy. But unless a majority of our supreme court agrees, I cannot conclude that due process requires it.

¶47        I recognize that in some instances, due process requires the state to offer rehabilitation services. *Jessie D.*, 251 Ariz. 574, ¶ 18. I offer no opinion on whether doing so was required here. The services were offered, so that issue is irrelevant. And even if DCS must provide services, it does not follow that due process also requires courts to consider the results of those services in analyzing the applicability of a statutory ground under Section 8-533(B)(2). Rather, unless the applicable ground expressly requires courts to do so, it is sufficient to address this issue in the best-interests inquiry. *Alma S.*, 245 Ariz. 146, ¶ 15. As I detail below, the juvenile court did precisely that.

¶48        Nor am I persuaded that DCS prejudiced Maria by offering services then seeking termination, as the majority suggests and as M.P. has argued. Early in the case, DCS on multiple occasions proposed a concurrent case plan goal of reunification and severance. Thus, Maria was on notice that DCS might seek to terminate her parental rights, though the court did set a case plan of reunification that DCS followed.

## III.    The majority's conclusions rewrite the statutory scheme for terminating parental rights due to neglect

¶49        To some extent, the majority also grounds its conclusion in the view that "neglect is a malleable concept based on the circumstances," which include a parent's benefit from services. But because "neglect" is a statutorily defined term, we cannot reach such a conclusion without engaging in statutory construction. The majority does very little. And to the extent it purports to, it violates multiple rules of statutory construction. Specifically, the majority: (1) rewrites the requirements for terminating parental rights due to "neglect"; (2) ignores the statutory context, which does not make subsequent education and conduct relevant to a

determination of "neglect"; and (3) overlooks Section 8-533's statutory history.

## A. The statutory text does not support the majority's analysis

¶50 As required in any case of statutory construction, I begin my analysis with the text. *Planned Parenthood Ariz., Inc. v. Mayes*, 257 Ariz. 137, ¶ 15 (2024) ("We look first to the language of the provision, for if the statutory language is clear, judicial construction is neither required nor proper." (cleaned up)). As the majority does not dispute, Section 8-533(B)(2) reads "has neglected," so past neglect can support termination.

¶51 The majority, however, suggests that the statutory definition of "neglect" requires consideration of Maria's "subsequent education and conduct." In support, it cites no statutory language. Instead, it relies on a fifty-year-old case, *In re Pima County Juvenile Action No. S-111*, 25 Ariz. App. 380, 389 (1975). That case does say, "The expression 'neglect' has no fixed meaning; its meaning varies as the context of circumstances changes." *Id.* But in the very next sentence, it cites a legislative definition of "neglected." *Id.* That is the essence of a fixed meaning, even if it may be difficult to apply in some cases. And since then, the legislature has refined the definition of "neglect" to be even more precise. § 8-201(25)(a).

¶52 That definition unambiguously does not require consideration of a parent's subsequent education and conduct. It looks instead to whether a parent's "inability or unwillingness" to provide basic needs placed the child's "health or welfare" at substantial risk. § 8-201(25)(a). By reading an additional requirement into that definition, the majority improperly rewrites it. The majority also rewrites Section 8-533(B)(2) by adding the requirement that courts consider subsequent conduct. *See Brionna J.*, 255 Ariz. 471, ¶ 27 ("Thus, to the extent that the court of appeals imposed an additional showing of parental unfitness outside § 8-533(B)(8)(c)'s elements, it misinterpreted the statute.").

## B. The majority ignores the broader statutory context

¶53 The broader statutory context also reinforces the understanding that a court may find "neglect" without considering a parent's subsequent conduct. *S. Ariz. Home Builders Ass'n v. Town of Marana*, 254 Ariz. 281, ¶ 31 (2023) (requiring courts to consider "broader statutory context, unless the legislature directs us to do otherwise").

¶54          Unlike Section 8-533(B)(2), many of the grounds for termination expressly require courts to consider matters that arose after the conduct that resulted in the child being removed.  Among these is subsection (B)(3), which concerns mental illness, substance abuse, and similar issues.  It requires consideration of whether "there are reasonable grounds to believe that the condition will continue for a prolonged indeterminate period."   Subsection (B)(4), which concerns incarcerated parents, is another example.  It requires courts to consider "the unfitness of that parent to have future custody and control of the child" or "if the sentence of that parent is of such length that the child will be deprived of a normal home for a period of years."  Yet another example is subsection (B)(10), which concerns parents who have had their rights previously terminated under certain circumstances.  It requires consideration of whether the parent is "currently unable to discharge parental responsibilities due to the same cause."

¶55          For one of the most common grounds for termination, the statute expressly requires courts to consider a parent's participation in services.  That ground, sometimes referred to as "time in care," is set forth in subsection (B)(8).  That subsection includes three categories.  Among these is subsection (B)(8)(b), which concerns a child under three years old who has been in an out-of-home placement for six months or more, where the parent "has substantially neglected or willfully refused to remedy the circumstances that cause the child to be in an out-of-home placement."  In evaluating this issue, courts must consider the "refusal to participate in reunification services offered by [DCS]."  *See also* § 8-533(B)(11) (allowing termination after child returned home, then removed again, where agency "made diligent efforts to provide appropriate reunification services").

¶56          When the legislature includes a requirement in some contexts but not others, we must effectuate that distinction.  In Latin, the rule is *expressio unius est exclusio alterius*—the expression of one item implies the exclusion of others. *City of Surprise v. Ariz. Corp. Comm'n*, 246 Ariz. 206, ¶ 13 (2019).   As applied here, the legislature's expression of rehabilitation requirements for some grounds under Section 8-533(B) implies their exclusion in the remaining grounds, such as subsection (B)(2).   This conclusion is further reinforced by other statutory grounds that also allow termination based on past conduct.  *See, e.g.*, § 8-533(B)(4) (allowing termination where parent has been convicted of felonies that "prove the unfitness of that parent to have future custody and control of the child"); (B)(12) (allowing termination where parent "committed a sexual assault against the petitioning parent and the child was conceived as a result of the sexual assault").

19

¶57        In its sole attempt to engage in statutory construction, the majority reasons that this distinction among the statutory grounds would produce an absurd result.  I agree that the result is harsh.  But it is not absurd.  *See Members of Bd. of Educ. Of Pearce Union High Sch. Dist. v. Leslie*, 112 Ariz. 463, 465 (1975) ("[C]ourts must observe the natural import of the language used and are not free to extend the meaning though the result may be harsh, unjust or mistaken policy.").  The legislature deemed certain categories of conduct sufficient to terminate parental rights regardless of subsequent conduct.  It is not absurd to include neglect among these categories, even if we might prefer a more forgiving policy.

¶58        At any rate, even if the result were absurd, the majority is not free to add new statutory requirements.  It must still ground its analysis in the statutory language.  *See Welch v. Cochise Cnty. Bd. of Supervisors*, 251 Ariz. 519, ¶ 15 (2021) (requiring use of "other interpretive tools" when plausible interpretation of statute leads to absurd results).  It has not done so.  The statutory scheme is unambiguously not susceptible to the construction the majority gives it.

### C. The majority's reading is at odds with the statutory history

¶59        Even if the definition of "neglect" were ambiguous, the tools for statutory construction counsel against the majority's view.  Among those tools is the statute's "historical background."  *Planned Parenthood*, 257 Ariz. 137, ¶ 17.  This includes the "historical sequence" giving rise to the current statutory scheme.  *Roberts v. State*, 253 Ariz. 259, ¶ 25 (2022).

¶60        Here, the statutory history is illuminating.  In 1997, Section 8-533(B) was amended to require that, regardless of the ground for termination alleged, courts must consider "the availability of reunification services to the parent and the participation of the parent in these services."  1997 Ariz. Sess. Laws, ch. 222, § 1 (H.B. 2255).  The following year, though, the legislature amended the statute again, this time to remove that language.  1998 Ariz. Sess. Laws, ch. 276, § 1 (H.B. 2645).  Since then, availability and participation in reunification services has been relevant only where required by the subsection that supplied the alleged ground for termination.  *Toni W. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 61, ¶ 9 (App. 1999).

¶61        The majority's interpretation reverts our law back to 1997, in spite of the 1998 amendment.  *See Planned Parenthood*, 257 Ariz. 137, ¶ 31 ("We do not interpret the act to negate its own purpose.").  Now, even where the statutory ground says nothing about participation in

reunification services, courts must consider it at the first step of the inquiry. I cannot agree. In my view, there is no basis for the majority's conclusion that "neglect" should be rewritten as "malleable" enough to include a parent's rehabilitation efforts.

## IV.     Sufficient evidence supports the juvenile court's conclusion

¶62          Having concluded that neither due process nor the rules of statutory construction support the majority's approach, I turn next to application of the statutory text. Our standard of review requires us to affirm the juvenile court if its conclusion is supported by reasonable evidence, and if the legal conclusions are not clearly erroneous. *Brionna J.*, 255 Ariz. 471, ¶¶ 30-31.

### A. The evidence supports the juvenile court's conclusion that Maria neglected M.P.

¶63          I first address the juvenile court's conclusion that Maria neglected M.P. As noted, the definition of neglect includes a parent's "inability or unwillingness . . . to provide [a] child with . . . food . . . or medical care" if it "causes substantial risk of harm to the child's health or welfare." § 8-201(25)(a).

¶64          Here, when Maria took seven-month-old M.P. to the hospital in September 2023, M.P. weighed only seven pounds and her brain was atrophied. Describing her appearance, a detective testified, "Her eyes were closed. Her face appeared sunken. Her eyes appeared sunken. Her cheek bones were sticking out. . . . And it just looked like skin over bones." A treating physician recalled the "profoundness of the malnutrition and failure-to-thrive situation," which resulted in M.P. initially being treated in the intensive care unit. And a DCS investigator described her as "resembl[ing] pictures from World War II of children from Auschwitz of being starved to death."

¶65          Given these circumstances, there was clear and convincing evidence of neglect. Maria failed to provide M.P. with food or timely medical care for malnutrition. That failure profoundly damaged M.P.'s health. Thus, the juvenile court did not err in concluding that Maria had neglected M.P.

### B. The evidence supports the juvenile court's best-interests findings

¶66  I turn next to the best-interests findings. In making those findings, the juvenile court extensively discussed Maria's participation in services, including the benefits she received. This was the appropriate analytical step for doing so. *See Alma S.*, 245 Ariz. 146, ¶ 15 ("We recognize that although the focus of the best-interests inquiry is on the child, courts should consider a parent's rehabilitation efforts as part of the best-interests analysis."). The majority notes that this may not have been necessary, as the best-interests requirement can be satisfied in several ways. But we need not consider the implications of declining to consider a parent's rehabilitation at this stage, given that the court did so here.

¶67  Maria benefited from the services she received. She displays improved knowledge about child development and an awareness of how her prior care for M.P. was inadequate. Of the services offered, the only one that she did not participate in was a psychological evaluation. And her refusal to do so was on her counsel's advice due to a related criminal investigation, which subsequently concluded. By the time of trial, she was willing to undergo the evaluation.

¶68  Maria also benefited from therapy, including developing improved coping skills, safety planning, and support systems. Her physical condition and behavior improved, and she developed a proper diet. These improvements likely helped her overcome her mental-health struggles, including postpartum depression, which contributed to her neglect of M.P.

¶69  M.P.'s condition has also improved significantly. As of the trial date, she was in the 80th percentile for height and weight, and she was meeting developmental milestones. Multiple specialists no longer deemed it necessary to treat her. And Maria has been extensively involved in M.P.'s life as these improvements occurred, through lengthy and frequent supervised visits. Maria characterized herself as M.P.'s primary caregiver. She has developed a strong bond with M.P. All of this evidence counsels against finding termination in M.P.'s best interests. *See Alma S.*, 245 Ariz. 146, ¶ 13.

¶70  Other evidence, however, pointed to a contrary conclusion. The juvenile court's chief concern was that Maria would be unable and unwilling to provide a safe home for M.P. given the history of domestic violence from Alonzo, M.P.'s father. Indeed, Maria acknowledged that when M.P. was at the hospital, Maria had lied to a Tucson Police

Department detective to protect Alonzo. She had also allowed M.P. to have contact with him, despite his having been arrested for attempted strangulation and a court order prohibiting contact. He appeared to have been living in an apartment with Maria when M.P. was taken to the hospital. Alonzo acknowledged that he had stayed with her "[s]ometimes."

¶71         Even after services had been provided, concerns persisted that Maria and Alonzo would resume a relationship. This was a reasonable concern because Alonzo had not been working to correct his violent tendencies. In his testimony, Alonzo likewise seemed to suggest that he wanted to resume a relationship with Maria, though she testified that she was not open to that possibility. Weighing the evidence, the juvenile court was unconvinced that M.P. would be "safe in [Maria's] care until she can determine those individuals who pose a risk of harm to the child's safety and well-being—most importantly, Father." Also counseling in favor of termination is that M.P. was adoptable.

¶72         In addition, there were concerns about the timeliness of Maria's explanations that she had neglected M.P. due to mental-health issues. Maria did not raise these explanations to DCS until after it had changed the case plan to termination. She testified that this was because she "did not realize at the time" that she had been experiencing depression. She also testified that she did not realize she had been getting insufficient nutrition to breastfeed M.P., which caused her malnutrition.

¶73         Under these circumstances, whether termination was in M.P.'s best interests was a close question. I am not sure I would have weighed the evidence as the juvenile court did. Maria's self-improvement was remarkable, as was the improvement in her parenting abilities. But as an appellate court, we owe deference to the juvenile court, which observed the proceedings and was able to weigh the witnesses' credibility. We may not reweigh the evidence. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, ¶ 12 (App. 2002). Under our standard of review, I cannot find any error in that court's conclusions. I therefore believe we must affirm the termination of Maria's parental rights. I respectfully dissent.